UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                              05 Cr. 673 (LAP)

ABDULRAHMAN FARHANE,
a/k/a "Abderr Farhan,"

Defendant.

---

ABDULRAHMAN FARHANE,

Petitioner,

v.                                              18 Civ. 11973 (LAP)

UNITED STATES OF AMERICA,

Respondent.

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Jun Xiang
Assistant United States Attorney
    *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

    A.  Facts .......................................................................................................................... 2

    B.  Procedural History ................................................................................................... 3

LEGAL STANDARD ............................................................................................................. 6

ARGUMENT ........................................................................................................................ 6

I.    The Sixth Amendment Does Not Apply to Advice on Denaturalization ............................... 7

    A.  Even after Padilla v. Kentucky, the Sixth Amendment Right to Counsel Does Not Apply to Collateral Consequences ........................................................................................ 7

    B.  Civil Denaturalization Is at Most a Collateral Consequence ............................................. 10

II.    Farhane Cannot Establish a Right to Relief under Strickland v. Washington ...................... 13

    A.  Defense Counsel's Performance Was Not Deficient ........................................................ 14

    B.  No Prejudice Resulted to Farhane ................................................................................ 17

    CONCLUSION ..................................................................................................................... 21

i

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

Anders v. California, 386 U.S. 738 (1967) ...............................................................................5

Chaidez v. United States, 568 U.S. 342 (2013) ....................................................................8, 9

Galviz Zapata v. United States, 431 F.3d 395 (2d Cir. 2005)...................................................6

Gutierrez v. United States, 560 F. App'x 924 (11th Cir. 2014) (unpublished) .........................16

Kovacs v. United States, 744 F.3d 44 (2d Cir. 2014) .........................................................16, 18

Lafler v. Cooper, 566 U.S. 156, 177 (2012) ...........................................................................8

Lee v. United States, 137 S. Ct. 1958 (2017) .....................................................................19, 20

McMann v. Richardson, 397 U.S. 759 (1970) .........................................................................8

Michel v. United States, 507 F.2d 461 (2d Cir. 1974)..............................................................8

Padilla v. Kentucky, 559 U.S. 356 (2010) ...................................................................... *passim*

Pham v. United States, 317 F.3d 178 (2d Cir. 2003) ................................................................6

Pizzuti v. United States, No. 01 Cr. 1122 (LAP), 2019 WL 274968 (S.D.N.Y. Jan. 10, 2019) ............................................................................................................................. *passim*

Rodriguez v. United States, 730 F. App'x 39 (2d Cir. 2018) (summary order) .........................16

Strickland v. Washington, 466 U.S. 668 (1984) ............................................................... *passim*

Triana v. United States, 205 F.3d 36 (2d Cir. 2000)..................................................................6

United States v. Ash, 413 U.S. 300 (1973)...............................................................................7

United States v. Bokun, 73 F.3d 8 (2d Cir. 1995) .....................................................................6

United States v. Morrison, 449 U.S. 361 (1981) ......................................................................8

United States v. Santelises, 476 F.2d 787 (2d Cir. 1973) .........................................................8

United States v. Sinclair, 409 F. App'x 674 (4th Cir. 2011) (unpublished) .............................16

United States v. Wade, 388 U.S. 218 (1967) ............................................................................8

United States v. Youngs, 687 F.3d 56 (2d Cir. 2012)......................................................9, 10, 12

Wilson v. McGinnis, 413 F.3d 196 (2d Cir. 2005) ...................................................................8

**<u>Statutes and Other Authority</u>**

8 U.S.C. § 1101 ...............................................................................................................10, 11

8 U.S.C. § 1227 .........................................................................................................11, 14, 15

8 U.S.C. § 1427 ...............................................................................................................11, 15

8 U.S.C. § 1451 ...............................................................................................................10, 15

18 U.S.C. § 371 ..................................................................................................................1, 4

18 U.S.C. § 1001 ................................................................................................................1, 4

18 U.S.C. § 2339A ................................................................................................................4

28 U.S.C. § 2255 ................................................................................................................1, 6


8 C.F.R. § 316.10 ............................................................................................................10, 11

The Government respectfully submits this memorandum of law in opposition to defendant Abdulrahman Farhane's motion, under 28 U.S.C. § 2255, to vacate his guilty plea and conviction for conspiring to commit money laundering, in violation of 18 U.S.C.§ 371, and making false statements in connection with a terrorism investigation, in violation of 18 U.S.C. § 1001(a)(2).

## PRELIMINARY STATEMENT

In 2006, Abdulrahman Farhane pleaded guilty—pursuant to a negotiated plea agreement that reduced the maximum term of imprisonment from 23 years to 13 years—to crimes arising out of his efforts to help send money overseas to terrorists.  At the time of the plea and at all times in this case, Farhane was a naturalized U.S. citizen.  The Court sentenced Farhane to a term of imprisonment of 13 years—the maximum sentence available under the plea agreement and significantly below the otherwise applicable U.S. Sentencing Guidelines range.  Farhane now seeks to vacate his conviction on the ground that he was not advised by counsel, in connection with his plea, that he could be subject to civil denaturalization.

Farhane's argument is meritless.  First, the Sixth Amendment does not require defense counsel to give advice about the risk of civil denaturalization, which is at most a collateral consequence of the criminal proceeding.  Second, even if the Sixth Amendment were applicable, Farhane cannot make out a claim under Strickland v. Washington, 466 U.S. 668 (1984). Prevailing professional norms do not require criminal defense counsel to offer advice about civil denaturalization.  Farhane also cannot establish prejudice because, even if he had been advised about the possibility of denaturalization, the outcome of the proceeding would have been the same.

1

## BACKGROUND

**A.     Facts**

This case arises from an international terrorism investigation by the Federal Bureau of Investigation ("FBI") in the months following the September 11, 2001 attacks.  The investigation centered on the provision of material support to international and domestic terrorists and terrorist organizations, including fundraising, financing, and recruitment.

As part of the investigation, on December 7, 2001, a confidential source working at the direction of the FBI ("CS-1") visited a bookstore operated by Farhane.  During that visit, CS-1 and Farhane discussed, among other topics, sending material support to jihadist fighters overseas.  Specifically, CS-1 and Farhane discussed sending money to buy advanced weapons and wireless equipment.  Farhane told CS-1 that he could help CS-1 get the money overseas.  (Presentence Investigation Report ("PSR") ¶ 9.)  On December 11, 2001, CS-1 returned to the bookstore and spoke with Farhane.  During this conversation, CS-1 asked Farhane how to send money to jihadist fighters in Afghanistan and Chechnya.  Farhane replied that he would ask some "brothers" and get back to CS-1 with that information.  (Id. ¶ 10.)

 On December 12, 2001, when CS-1 returned to the bookstore, Farhane introduced CS-1 to Tarik Ibn Osman Shah.  In the ensuing conversation, Shah stated that he knew "some brothers" who were training with mujahedeen and that sending money to jihadist fighters would be "very difficult" due to government scrutiny.  Shah mentioned a "Spanish brother" who had been to Afghanistan as someone who could help send the money.  Farhane stated that he did not trust that person.  (Id. ¶ 11.)  On December 19, 2001, CS-1 and Farhane had another in-person conversation, during which Farhane stated that there were "people we trust" through whom money could be sent.  Farhane advised CS-1 to send less than $10,000 at a time in order to avoid

detection by law enforcement.  Farhane and CS-1 also discussed efforts that were underway to collect money at local mosques to support "fighters" in Afghanistan.  (Id. ¶ 12.)  Each of the above conversations was recorded.  Between December 20, 2001 and March 2, 2002, CS-1 and Farhane had approximately five more conversations, in person and over the phone, in which they discussed Shah and/or the transfer of money overseas.  (Id. ¶ 13.)

On April 19, 2002, Farhane became a naturalized U.S. citizen.  During the naturalization process, Farhane never disclosed his interactions with CS-1 and Shah.  Moreover, when asked in the written application and again at the naturalization interview whether he had ever knowingly committed a crime for which he was not arrested, Farhane answered that he had not.

On May 28, 2005, the FBI arrested Shah for conspiring to provide material support to Al Qaeda.  During a search of Shah's apartment, FBI agents found guns, other weapons, military training manuals, videotapes of speeches by Osama bin Laden, and a cell phone that contained telephone numbers for Farhane's bookstore.  (Id. ¶ 14.)

On June 9, 2005, FBI agents interviewed Farhane at his home.  In that interview, Farhane denied ever meeting in person with Shah or CS-1.  He further claimed that, while he did introduce Shah to CS-1, the reason he did so was because Shah ran a "Western Union"-type money transfer business.  Farhane also denied that he ever discussed with CS-1 or Shah the possibility of sending money to jihadist fighters overseas.  (Id. ¶¶ 15–16.)  The same day, an FBI agent conducted another interview with Farhane over the telephone.  During this call, which was recorded, Farhane repeated the false statements.  (Id. ¶ 17.)

### B.    Procedural History

On October 26, 2005, Farhane was arrested and charged in a complaint with making false statements to law enforcement in connection with a terrorism investigation, in violation of 18

U.S.C. § 1001(a)(2).  (Compl., Doc. No. 1.) [1]  Farhane retained Michael Hueston, who continued to represent him through sentencing.  On February 8, 2006, Farhane was charged in a superseding indictment with one count of conspiring to provide material support to jihadists in Afghanistan and Chechnya, in violation of 18 U.S.C. § 2339A, as well as one count of making false statements.  (S2 Ind., Doc. No. 21, ¶¶ 5–7.)  The charged offenses carried a combined statutory maximum of 23 years imprisonment.  Following indictment, Farhane sought— unsuccessfully—to suppress evidence in the case.  (Doc. Nos. 60–62.)

In late 2006, after a period of negotiation, the parties agreed to enter into a plea agreement under which the Government would dismiss the 18 U.S.C. § 2339A count and Farhane would plead guilty to one count of conspiring to commit money laundering, in violation of 18 U.S.C.§ 371, as well as the false statement count.  Due to the difference in the statutory maximums for 18 U.S.C. § 2339A (15 years) and 18 U.S.C. § 371 (5 years), the plea agreement effectively reduced the maximum prison sentence by ten years.  The parties agreed that, but for the statutory maximum, the applicable U.S. Sentencing Guidelines range would be 30 years to life imprisonment.  (Plea Agreement, Doc. No. 231-1, at 4.)

On November 9, 2006, Farhane pleaded guilty to a superseding information charging him with the two counts set forth in the plea agreement.  (Doc. Nos. 85, 86.)  In his plea allocution, Farhane admitted that he "agreed with others in the month[s] of November and December of 2001 to transfer money for mujahideen in Afghanistan and Chechnya."  (Tr. Plea 20:3–10.)[2]  He

---

[1]    Citations to "Doc. No." refers to filings in the criminal case before this Court, United States v. Farhane, 05 Cr. 673 (LAP).  "Mem." refers to Farhane's memorandum of law in support of the instant motion.  (Doc. No. 229.)

[2]    The transcript states that this plea hearing took place on November 6, 2006, but it appears from the docket that the hearing actually took place on November 9, 2006.

further admitted that he lied to FBI agents "while they were doing investigation with regard to transferring money outside of United States to mujahideen in Afghanistan and Chechnya." (Id. at 22:12–22.)

On April 16, 2007, the Court sentenced Farhane principally to a term of imprisonment of 13 years, the maximum possible sentence under the plea agreement. (Tr. Sent'g 19:18–22.) The Court noted that the sentence fell well below the otherwise applicable Guidelines range, even though Farhane's conduct appeared to "fall within the heartland of the terrorism-related activities that Congress has sought to punish severely and to deter." (Id. at 3:8–15; 16:9–13.)

On May 3, 2007, Farhane filed a notice of appeal. (Doc. No. 140.) On February 7, 2008, CJA appellate counsel filed a brief, pursuant to Anders v. California, 386 U.S. 738 (1967), seeking to withdraw. On February 4, 2011, the Second Circuit granted the motion to withdraw and dismissed the appeal. Farhane completed his prison sentence on or about May 30, 2017.

On August 13, 2018, the U.S. Attorney's Office for the Eastern District of New York filed a civil complaint against Farhane seeking to revoke his U.S. citizenship. United States v. Farhane, 18 Civ. 4347 (MKB) (E.D.N.Y.) (the "Denaturalization Proceeding"). (See Denat. Compl., Denat. Doc. No. 1.)[3] The complaint alleges: (1) that Farhane illegally procured naturalization because the conduct underlying the guilty plea showed an absence of the statutorily required good moral character (id. ¶¶ 56–64); (2) that Farhane illegally procured naturalization because his false testimony under oath, for the purpose of obtaining naturalization, showed an absence of good moral character (id. ¶¶ 65–72); and (3) that Farhane procured naturalization by concealment of a material fact and willful misrepresentation (id. ¶¶ 73–80).

---

[3]     Citations to "Denat. Doc. No." refer to filings in the Denaturalization Proceeding, United States v. Farhane, 18 Civ. 4347 (MKB) (E.D.N.Y.). The Denaturalization Proceeding identifies Farhane's aliases as "Abdulrahman Farhane," "Abderr Farhan," and "Abdar Ferhan."

On December 19, 2018, while serving his term of supervised release, Farhane filed the instant motion under 28 U.S.C. § 2255, seeking to vacate his guilty plea and conviction on the ground that defense counsel provided ineffective assistance by failing to advise him of the possibility of civil denaturalization and deportation.  (Doc. No. 220.)  On February 20, 2019, the Denaturalization Proceeding was stayed pending a decision on the instant motion.  (Denat. Doc. No. 15.)

## LEGAL STANDARD

Under 28 U.S.C. § 2255, a defendant who is in custody—including on supervised release—may move to vacate his conviction on, as relevant here, the ground "that the sentence was imposed in violation of the Constitution or laws of the United States."  Relief under § 2255 is narrow and is "generally available . . . only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

The movant bears the burden of proving a factual basis for the motion.  See Galviz Zapata v. United States, 431 F.3d 395, 399 (2d Cir. 2005); Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000).  Where it is clear from the existing record and written submissions that the movant has failed to satisfy his burden, the court may deny the motion without a hearing.  See Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003).

## ARGUMENT

Under the Sixth Amendment, a defendant is entitled to effective assistance of counsel in a criminal proceeding.  Farhane argues that he received ineffective assistance because, in

6

connection with his plea, he never received advice from his criminal defense counsel that he could be subject to denaturalization for the conduct underlying his plea.[4]

Farhane is wrong.  First, the Sixth Amendment does not apply to advice about collateral consequences, and civil denaturalization is at most a collateral consequence.  Padilla v. Kentucky, 559 U.S. 356 (2010)—which held that the Sixth Amendment reaches advice to noncitizens about deportation—does not apply to advice to U.S. citizens about the possibility of civil denaturalization.  Second, even if the Sixth Amendment did apply, prevailing professional standards did not require defense counsel to offer affirmative advice about denaturalization and Farhane cannot show that he was prejudiced.

## I.     The Sixth Amendment Does Not Apply to Advice on Denaturalization

Farhane was not deprived of his Sixth Amendment right to counsel because no such right exists with respect to advice on civil denaturalization.

### A.     Even after Padilla v. Kentucky, the Sixth Amendment Right to Counsel Does Not Apply to Collateral Consequences

The Sixth Amendment provides that in "all *criminal prosecutions*, the accused shall . . . have the Assistance of Counsel for his *defence*." U.S. Const. Amend. VI (emphases added). Historically centered on the right to counsel at trial, United States v. Ash, 413 U.S. 300, 309 (1973), the Sixth Amendment has been interpreted over time to encompass "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from

---

[4]      At points in the defense brief, Farhane appears to suggest that, because the Court did not advise him about the possibility of civil denaturalization during the plea colloquy, his plea was also not knowing and voluntary.  (See Mem. at 9.)  However, Farhane stops short of asserting a Fifth Amendment Due Process claim on that ground, so the Government does not respond to any such claim here.  Should Farhane later claim that the instant motion includes a Fifth Amendment argument, the Government reserves the right to submit additional briefing responding to that argument.

the accused's right to a fair trial." United States v. Wade, 388 U.S. 218, 226 (1967); see also Lafler v. Cooper, 566 U.S. 156, 177 (2012).  It remains the case, however, that the purpose of the right to counsel is "to assure fairness in the *adversary criminal process*."  United States v. Morrison, 449 U.S. 361, 364 (1981) (emphasis added).  The Sixth Amendment does not guarantee assistance of counsel in all aspects of a criminal defendant's life.

Where the right to counsel exists, it encompasses "the right to the effective assistance of counsel," McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970), and claims of ineffective assistance must be considered under the test set forth in Strickland v. Washington, 466 U.S. 668, 686 (1984).  However, if, as a "threshold" matter, the Sixth Amendment does not apply, no Strickland analysis is necessary.  Chaidez v. United States, 568 U.S. 342, 349 (2013).

Given the scope of the Sixth Amendment, the Second Circuit (and every other circuit to have considered the issue) has drawn a distinction between direct and collateral consequences of the criminal proceeding and held that the Sixth Amendment applies to the former but not the latter.  Chaidez, 568 U.S. at 350 & n.7 (citing cases, including Russo v. United States, 173 F.3d 846 (2d Cir. 1999)).  A consequence is direct if it has a "definite, immediate and largely automatic effect on the range of the defendant's punishment."  Wilson v. McGinnis, 413 F.3d 196, 199 (2d Cir. 2005) (citation and quotation marks omitted).[5]  By contrast, a consequence is collateral if it is not part of the criminal proceeding; examples include "the defendant's civil liabilities, his eligibility for a variety of societal benefits, his civil rights or his right to remain in this country."  Michel v. United States, 507 F.2d 461, 466 (2d Cir. 1974).

---

[5]     The Second Circuit has applied the same direct-collateral distinction in the Due Process context to resolve challenges to the knowingness and voluntariness of guilty pleas.  Wilson is a Due Process case.  See also United States v. Santelises, 476 F.2d 787, 789 (2d Cir. 1973); Michel v. United States, 507 F.2d 461, 466 (2d Cir. 1974).

In Padilla v. Kentucky, 559 U.S. 356 (2010), the Supreme Court addressed whether the Sixth Amendment right to counsel encompasses advice to noncitizens about the deportation consequences of conviction.  The Court concluded that, because it is "intimately related to the criminal process" and "nearly an automatic result for a broad class of noncitizen offenders," deportation is "uniquely difficult to classify as either a direct or a collateral consequence."  Id. at 366.  Based on those considerations, the Court concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel."  Id.

The Supreme Court took care to emphasize that it was not calling into question the vitality of the direct-collateral distinction in general and that its decision was driven by the "unique nature of deportation."  Id.; see also Chaidez, 568 U.S. at 355 ("Even in Padilla we did not eschew the direct-collateral divide across the board.").  The holding of Padilla was specific and narrow: "[t]he severity of deportation . . . underscores how critical it is for counsel to inform her *noncitizen* client that he faces a risk of *deportation*."  559 U.S. at 373–74 (emphases added).

Following Padilla, the Second Circuit has continued to apply the direct versus collateral distinction.  In United States v. Youngs, 687 F.3d 56 (2d Cir. 2012), the Circuit held that civil commitment of a sex offender is a collateral consequence and that the Fifth Amendment therefore did not require the defendant to be advised of the possibility of civil commitment in connection with his plea.  The Circuit rejected the defendant's argument that Padilla had eliminated the direct-collateral distinction, noting that Padilla was driven by the Supreme Court's "deeming deportation a 'virtually inevitable' result of a noncitizen's conviction for certain offenses."  Id. at 62.  Civil commitment, by contrast, was "not nearly as certain" because a

"district court ultimately determines whether a defendant is civilly committed" and the

Government bears the burden of proving that civil commitment is appropriate.  Id. at 63.[6]

### B.      Civil Denaturalization Is at Most a Collateral Consequence

Civil denaturalization is at most a collateral consequence of a guilty plea and therefore

falls outside the scope of the Sixth Amendment.

In many cases, including Farhane's, civil denaturalization is not a *consequence* of his

guilty plea at all.  As discussed above, the grounds for revocation of citizenship alleged in the

Denaturalization Proceeding are that:

> (1) Farhane could not establish the "requisite good moral character for naturalization because he *committed unlawful acts* during the statutory period that reflected adversely on his moral character and there were no extenuating circumstances that would lessen his guilt," (relying on the catch-all provision of 8 U.S.C. § 1101(f) and 8 C.F.R. § 316.10(b)(3)(iii));
>
> (2) Farhane was "statutorily barred from showing that he was a person of good moral character because he *gave false testimony*, under oath during the statutory period, for the purpose of obtaining an immigration benefit, specifically naturalization" (relying on the catch-all provision of 8 U.S.C. § 1101(f) and 8 C.F.R. § 316.10(b)(2)(vi)); and
>
> (3) Farhane "procured his naturalization *by concealment* of a material fact and *by willful misrepresentation*" (relying on 8 U.S.C. § 1451(a)).

(emphases added) (Denat. Compl. ¶¶ 58, 67, 74.)[7]  Each ground of revocation rests on Farhane's

*conduct* well before he was charged in this case and certainly before he pleaded guilty.  The first

---

[6]      Youngs also distinguished Padilla on the ground that Padilla arose in the Sixth Amendment context.  687 F.3d at 62.  However, Youngs did not suggest that, in the Sixth Amendment context, Padilla extends beyond advice to noncitizens about deportation.  Id. ("Padilla's holding was limited to the requirement of counsel to advise of deportation pursuant to their Sixth Amendment responsibilities.").

[7]      The "catch-all provision" of 8 U.S.C. § 1101(f) provides that: "The fact that any person is not within any of the [enumerated] classes [of ineligibility] shall not preclude a finding that for other reasons such person is or was not of good moral character."  See also 8 C.F.R. § 316.10(b).

The "statutory period" referenced in the first and second grounds for revocation is the period that begins five years before the naturalization application is filed and that continues until

ground rests on Farhane's conduct in 2001, when he discussed sending money to terrorists with CS-1 and Shah, and the second and third grounds rest on Farhane's conduct in the naturalization process itself.  Regardless of whether Farhane pleaded guilty, what charges he pleaded guilty to, or *whether he was charged with a crime at all*, the exact same grounds for denaturalization would exist.  Farhane is thus wrong when he suggests that his guilty plea is the "predicate" of the Denaturalization Proceedings.  (Mem. at 1.)  See Pizzuti v. United States, No. 01 Cr. 1122 (LAP), 2019 WL 274968, at *3 (S.D.N.Y. Jan. 10, 2019) ("[The defendant's] false testimony and concealment of his criminal activity are the causes of the proceedings against him, not his guilty plea and conviction." (quotation marks and brackets omitted)).  Denaturalization—on the grounds alleged against Farhane[8]—is completely unlike the deportation of noncitizens discussed in Padilla, which was legally predicated on the criminal conviction itself.  See Padilla, 559 U.S. at 359 n.1; 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission *has been convicted* . . . [of a controlled substance offense] is deportable.") (emphasis added)).

Separate from the fact that Farhane's guilty plea is legally irrelevant to the grounds alleged for denaturalization, the guilty plea is also unnecessary for evidentiary purposes.  The Government has all the evidence it needs to seek denaturalization without the guilty plea: the

---

the date of naturalization.  8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1).  In Farhane's case, that period was from on or about March 22, 1996 until April 19, 2002, which spans the period of time when Farhane was talking to CS-1 and Shah about sending money to terrorists overseas.

[8]   Theoretically, certain grounds for denaturalization may turn on the fact of conviction. See, e.g., 8 U.S.C. § 1101(f)(5) (rendering ineligible "one who has been convicted of two or more gambling offenses committed during [the statutory] period"); id. § 1101(f)(8) (rendering ineligible "one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43))").  No such ground is asserted against Farhane.  Farhane cannot be denaturalized under § 1101(f)(8) because even if the offenses he was convicted of were aggravated felonies, see id. § 1101(a)(43)(D), (S), (U), he was not *convicted* of those offenses until 2006.  Those convictions therefore did not make him ineligible at the time of his naturalization in 2002.

taped recordings of Farhane conspiring to send money to terrorists were created in 2001, and Farhane's false statements and omissions in the naturalization process occurred in or before 2002.  For these reasons, civil denaturalization is not a *consequence* of Farhane's guilty plea, and his failure to receive advice on denaturalization did not impair his Sixth Amendment right to counsel.  See Pizzuti, 2019 WL 274968, at *3.

Even if civil denaturalization could be construed to be a consequence of Farhane's guilty plea, it would at most be a collateral consequence.  Like the civil commitment found to be collateral in Youngs, 687 F.3d at 63, denaturalization on the grounds asserted against Farhane is "uncertain" to follow from the guilty plea because it does not turn on whether the defendant has been convicted.  Like civil commitment, denaturalization requires the Government to bring a separate civil proceeding at which the Government bears the burden of proof, see Kungys v. United States, 485 U.S. 759, 772 (1988), and the "district court ultimately determines" whether denaturalization is appropriate.  Cf. Youngs, 687 F.3d at 63.  As to the first ground for revocation, the district court must decide not simply whether Farhane engaged in unlawful conduct, but also whether that conduct reflected adversely on his moral character and whether "there were no extenuating circumstances that would lessen his guilt."  (Denat. Compl. ¶ 58.)  As to the second and third grounds for revocation, the district court must decide whether Farhane lied or concealed his conduct in the context of his naturalization application.  (Id. ¶¶ 67, 74.)  The district court's consideration of those questions is necessarily broader than just consideration of whether Farhane pleaded guilty to certain crimes.  In short, denaturalization lacks the characteristics that led Padilla to treat deportation as "uniquely difficult to classify as either a direct or a collateral consequence."  559 U.S. at 366.

12

Farhane elides the distinction between direct and collateral consequences and asserts that, under <u>Padilla</u>, any "particularly severe" consequence of a guilty plea comes within the scope of the Sixth Amendment.  (Mem. at 8.)  Citing cases extolling the importance of citizenship, Farhane argues that depriving a person of U.S. citizenship is a "severe consequence of his plea" and therefore his failure to receive advice on denaturalization constituted a Sixth Amendment violation.  (<u>Id.</u> at 9–10.)  The Government certainly does not dispute that U.S. citizenship is an important right and that revoking citizenship is concomitantly a serious matter.  But, as discussed above, whether the Sixth Amendment requires defense counsel to advise on a consequence of conviction does not turn simply on how "severe" that consequence might be.  Apart from immigration consequences, "criminal convictions can carry a wide variety of consequences . . . , including civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses."  <u>Padilla</u>, 559 U.S. at 376 (Alito, J., concurring in the judgment).  Different defendants may well place paramount importance on these collateral consequences.  That alone does not transform those collateral consequences into a part of the criminal proceeding.

Likewise, however much Farhane may now claim to value U.S. citizenship—and however valuable citizenship may be—it does not follow that the Sixth Amendment required Farhane's counsel to give advice on the possibility of denaturalization as part of the "defence" against "criminal prosecution[]."  U.S. Const. Amend. VI.

## II.    <u>Farhane Cannot Establish a Right to Relief under Strickland v. Washington</u>

Even if the Sixth Amendment applied, Farhane could not make out a claim for ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668.  Under <u>Strickland</u>, a

defendant must show, first, "that counsel's representation fell below an objective standard of reasonableness" and, second, that he suffered prejudice as a result. Id. at 688, 691–92. Farhane cannot meet either prong.

### A.      Defense Counsel's Performance Was Not Deficient

Farhane fails to establish the first prong of Strickland, that the performance of his counsel fell below "the wide range of reasonable professional assistance." 466 U.S. at 689. In assessing counsel's effectiveness, a court must consider "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Where the claim of ineffectiveness is predicated on a failure to investigate, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691.

Here, even assuming advice about civil denaturalization fell within the scope of the Sixth Amendment, it was not objectively unreasonable for defense counsel not to advise Farhane about the possibility of denaturalization.[9] The reasonableness of counsel's performance depends, in part, on "prevailing professional norms." Strickland, 466 U.S. at 688. In Padilla, for example, the Supreme Court referenced numerous professional guides recommending that defense counsel advise noncitizen clients about the possibility of deportation. 559 U.S. at 367 (citing authorities). Farhane has not attempted to show that, at the time his defense counsel negotiated the plea in

---

[9]      Farhane asserts, as an apparent separate argument, that his counsel was ineffective for failing to advise him of the possibility of *deportation*. (Mem. at 11–13.) That argument is meritless because, at the time of the plea, Farhane was a citizen and therefore could not be deported. See 8 U.S.C. § 1227 (defining classes of deportable aliens). Counsel's advice at the time it was given was not objectively unreasonable. See Pizzuti, 2019 WL 274968, at *3 ("At the time of his guilty plea, Petitioner was a naturalized citizen, and his conviction did not render him deportable."). To the extent Farhane is arguing that he would be deportable "upon his denaturalization" (Mem. at 12), that argument rests entirely on the merit of the denaturalization argument and is not an independent ground for relief.

2006, it was the prevailing practice among defense counsel to advise naturalized citizen clients about the possibility of civil denaturalization.  No court has held that there is a per se rule that defense counsel must advise all naturalized citizen clients about the possibility of denaturalization.[10]

Indeed, such a rule would make little sense.  Unlike noncitizens, whose status *as noncitizens* makes them subject to certain immigration consequences, see, e.g., 8 U.S.C. § 1227(a) ("Any alien . . . shall . . . be removed if the alien is within one or more of the following classes of deportable aliens . . ."), a person's status as a naturalized citizen does not make him more susceptible to immigration consequences than a natural-born U.S. citizen.  A naturalized U.S. citizen who, following lawful naturalization pursuant to 8 U.S.C. § 1427, commits a crime is treated exactly like a natural-born U.S. citizen.  What *may* make a naturalized citizen subject to denaturalization is if the *naturalization itself* was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation."  See 8 U.S.C. § 1451(a).  Those circumstances will not apply to all—or even many—naturalized citizen defendants.

Furthermore, as discussed earlier, it will often be the case that a guilty plea has no bearing on the basis for denaturalization.  If, as here, the basis for denaturalization is that the defendant committed unlawful conduct and lied about it in the naturalization process, (see Denat. Compl. ¶¶ 58, 67, 74), whether or not the defendant is later criminally charged (and pleads guilty) does not alter the bases for revocation.  See Pizzuti, 2019 WL 274968, at *3.  Where a

---

[10]    The Supreme Court has been especially cautious about crafting rules that would impose on criminal defense counsel the obligation to become expert in other specialties of the law.  See Padilla, 559 U.S. at 376 (Alito, J., concurring in the judgment) ("Criminal defense attorneys have expertise regarding the conduct of criminal proceedings.  They are not expected to possess—and very often do not possess—expertise in other areas of the law, and it is unrealistic to expect them to provide expert advice on matters that lie outside their area of training and experience.").

defendant would be subject to the same immigration consequences whether or not he pleads guilty, defense counsel cannot be deemed ineffective for failing to advise about those consequences in connection with the guilty plea.  See Gutierrez v. United States, 560 F. App'x 924, 927 (11th Cir. 2014) (unpublished) (rejecting claim of defendant who "never obtained legal status, and thus continued to be subject to removal" regardless of the plea); cf. United States v. Sinclair, 409 F. App'x 674, 675 (4th Cir. 2011) (unpublished) (same).

Farhane's reliance on the Second Circuit's summary order in Rodriguez v. United States, 730 F. App'x 39 (2d Cir. 2018), is misplaced.  Rodriguez does not—and cannot—stand for the proposition that defense counsel has an obligation to offer advice about civil denaturalization: Rodriguez was a case about *affirmative misadvice*.  In Rodriguez, the defendant alleged that, in response to her repeated inquiries about the possibility of immigration consequences, her lawyer told her that she "did not have to worry about the immigration consequences of a plea because she was a citizen." Id. at 41 (citation and quotation marks omitted).  The Second Circuit therefore relied on well-established law—predating Padilla—that affirmative misadvice about collateral consequences may constitute deficient performance, even if counsel was not required to offer advice in the first instance.  Id. at 42 (citing Kovacs v. United States, 744 F.3d 44, 50 (2d Cir. 2014)); see Kovacs, 744 F.3d at 50 (citing United States v. Santelises, 509 F.2d 703 (2d Cir.1975); Michel v. United States, 507 F.2d 461 (2d Cir.1974); United States v. Zilberov, 162 F.3d 1149 (2d Cir.1998) (unpublished summary order)).[11]  The Second Circuit did not hold in

---

[11]     Farhane cites Padilla to suggest that failure to advise should be treated just like affirmative misadvice.  (Mem. at 10–11.)  It is true that Padilla imposed an obligation to advise about deportation consequences and not merely to refrain from affirmative misadvice.  559 U.S. at 371.  The Supreme Court did so out of concern that limiting the holding to affirmative misadvice would create "an incentive [for counsel] to remain silent on matters of great importance, even when answers are readily available," and especially in regard to "a class of

Rodriguez—and has never held—that defense counsel may be deemed ineffective simply for failing to offer advice about civil denaturalization.  Indeed, no federal court has interpreted Padilla to require defense counsel to offer advice about the possibility of denaturalization to naturalized citizen clients.

Finally, Farhane adduces no facts to show that, in his particular case, it was objectively unreasonable for his defense counsel not to offer advice about civil denaturalization.  At all times in this case, Farhane was a U.S. citizen, so his counsel had no particular reason to be sensitive to the possibility of adverse immigration consequences.  Farhane points out that his counsel was aware that he was a naturalized citizen because that fact came up during the detention hearings.  (Mem. at 2.)  The transcripts of the hearings make clear, however, that defense counsel was mindful of Farhane's citizenship status because, in the context of opposing detention, he wanted to emphasize Farhane's ties to the United States.  (See Tr. Nov. 2, 2005 Det. Hr'g 17:24–25; Tr. Feb. 8, 2006 Det. Hr'g 19:8; Tr. Feb. 10, 2006 Det. Hr'g 4:6.)  There is nothing in the record—either at those hearings or elsewhere—to suggest that Farhane ever told his counsel that he "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation" his citizenship.  See Strickland, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.").

### B.      No Prejudice Resulted to Farhane

Farhane also fails to establish the second prong of Strickland, that "any deficiencies in counsel's performance [were] prejudicial to the defense."  466 U.S. at 692.  Defense counsel

---

clients least able to represent themselves."  Id. at 370–71.  Those considerations do not apply here.

successfully negotiated a plea agreement that lowered the maximum term of imprisonment from 23 to 13 years, in a case where the otherwise applicable Guidelines range was 30 years to life imprisonment.  Farhane cannot show that, had he been advised of the possibility of civil denaturalization, the result of the proceeding would have been any more favorable to him.

Where a claim of ineffective assistance is predicated on a failure to receive advice about immigration consequences in connection with a guilty plea, a defendant must prove that "but for counsel's unprofessional errors, there was a reasonable probability that the petitioner could have negotiated a plea that did not impact immigration status or that he would have litigated an available defense."  Kovacs, 744 F.3d at 52.  Farhane fails to show either form of prejudice.

Farhane cannot "demonstrate a reasonable probability that the prosecution would have accepted, and the court would have approved, a deal that had no adverse effect on the petitioner's immigration status."  Id.  No such plea could have been negotiated because no such plea was possible.  As discussed, the risk of denaturalization arose not from the fact of any criminal conviction or guilty plea, but from Farhane's unlawful conduct and dishonesty during the naturalization process.  See Pizzuti, 2019 WL 274968, at *3.  Accordingly, the terms of any plea would have no bearing on the possibility of denaturalization.  To use a fanciful and extreme example, even if defense counsel had persuaded the Government to drop all the criminal charges, Farhane still would have been subject to the risk of denaturalization.[12]

Furthermore, Farhane has made no showing that the Government and the Court would have been receptive to a plea on terms other than what was ultimately negotiated.  Farhane

---

[12]     It was not possible for the Plea Agreement to bind any authority other than the U.S. Attorney's Office for the Southern District of New York.  Farhane's Plea Agreement included the standard language on this point: "It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office."  (Plea Agreement at 7.)

committed serious crimes relating to international terrorism in the aftermath of the September 11, 2001.  The evidence against Farhane was overwhelming: he was recorded on a series of conversations talking about sending money to help jihadist fighters and he was recorded on a phone call with the FBI lying about those conversations.[13]

Likewise, Farhane cannot show that, had he been advised of the possibility of denaturalization, he would have insisted on going to trial.  In this context especially, "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies."  Lee v. United States, 137 S. Ct. 1958, 1967 (2017).  Courts "should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."  Id.  Here, there is nothing in the contemporaneous record to suggest that, had Farhane been advised of the possibility of denaturalization, he would have insisted on going to trial.  Farhane, who was 52 at the time, faced the prospect of a 23-year prison sentence.  The evidence was overwhelming, and he had no real defense to litigate.  Unlike the defendant in Lee, who stated during his plea colloquy that the possibility of deportation affected his decision to plead guilty, see 137 S. Ct. at 1968, Farhane never stated at *any time* (prior to the instant motion) that he placed paramount importance on avoiding denaturalization.

While a defendant's ties to the United States may bolster an assertion that avoiding removal was of overriding importance, see id. at 1968, Farhane's ties to the United States were not particularly strong.  According to the Presentence Report:

---

[13]      In particular, Farhane cannot show—and does not argue—that the Government would have agreed to a guilty plea under which he would not be required to plead guilty to unlawful conduct occurring in 2001, when his naturalization was pending.  In any event, even if the plea limited the time period of the charged conduct, that would have no effect on the possibility of denaturalization based on that conduct.  Unlike deportation cases, the basis for denaturalization is not a conviction on a particular charge, so the precise contours of the charge are irrelevant.

- Farhane was born in Morocco, was educated there, worked there, and did not come to the United States until he was in his mid-30s (PSR ¶¶ 46–52);

- Farhane's mother and all of his siblings resided in Morocco (id. ¶¶ 46–47); and

- After initially coming the United States in 1989, Farhane returned to Morocco multiple times and did not become a permanent resident until 1995 (id. ¶ 52–53).

Farhane points to statements in his sentencing submission that he valued achieving the "American dream" for himself and his family.  (Mem. at 14–15.)  But those statements were made in the context of seeking lenience at sentencing, not the in context of elucidating the decisionmaking process behind Farhane's plea.  (See Doc. No. 113-2; Tr. Sent'g 7:25–8:5.)  In any event, there is good reason to be skeptical of those professions of patriotism.  As the Court is aware, Farhane was recorded expressing far different sentiments about the United States:

- "We should not think of this as our country.  This is a country where we temporarily live."  (Tr. Feb. 10, 2006 Det. Hr'g 13:24–25.)

- "This is not a country where we should stay.  One should work hard here and then take off.  The longer one stays here, the more people make you sick."  (Id. 14:1–4.)

Even crediting Farhane's assertions now, it does not follow that he would have chosen to go to trial.  The possibility of denaturalization existed regardless of whether Farhane was convicted of any crimes.  The choice that Farhane confronted was to accept a guilty plea that capped his maximum prison sentence to 13 years, which included a possibility of denaturalization, or to go to trial on charges that carried a maximum penalty of 23 years, which also carried a possibility of denaturalization *even if he were acquitted*.  By contrast, in Lee, it was rational for the defendant to try for a "Hail Mary" at trial, risking "a year or two more of prison time," because deportation was tied to the fact of conviction, so an acquittal would have allowed him to avoid the adverse immigration consequence.  137 S. Ct. at 1967–69.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the Government respectfully requests that Farhane's

motion under 28 U.S.C. § 2255 be denied.


Dated:  New York, New York
        June 14, 2019


                                  Respectfully submitted,

                                  GEOFFREY S. BERMAN
                                  United States Attorney for the
                                  Southern District of New York


                          By:     _____
                                  Jun Xiang
                                  Assistant United States Attorney
                                  (212) 637-2289